UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| DEBORAH SMITH, *Plaintiff,* *v.* METROPOLITAN DISTRICT COMMISSION, *et al.,* *Defendants.* | Civil No. 3:14cv1466 (JBA) May 13, 2015 |

**RULING GRANTING PARTIAL MOTION TO DISMISS**

Plaintiff Deborah Smith brings this action against Defendants Metropolitan District Commission ("MDC") and Chief Financial Officer of the MDC John Zinzarella in his individual and official capacities, alleging violations of 42 U.S.C. § 1981, the First and Fourteenth Amendments to the United States Constitution (brought via 42 U.S.C. § 1983), and Conn. Gen. Stat. § 31-51q, arising out of the MDC's October 7, 2011 termination of Ms. Smith's employment at the MDC as an Accounting Administrator. Defendants now move [Doc. # 24] to dismiss Counts One and Two of the Amended Complaint [Doc. # 19] which allege violations of § 1981, on the ground that § 1981 does not provide for a private right of action against local government entities. Oral argument on the motion was held on April 7, 2015. For the following reasons, Defendants' partial motion to dismiss is granted.

## I.    Facts Alleged

On September 24, 1979, Plaintiff began work at the MDC as a Customer Service Representative. (Am. Compl. ¶ 6.) Thereafter, she became an Accounting Administrator, a position classified at the salary grade of EE-6. (*Id.* ¶¶ 6–7.) After 29 years working at the MDC at grade EE-6, on January 29, 2008, Ms. Smith sought to have

her job reclassified to EE-10 or EE-12 on the grounds that during the course of her career, she had taken on many added responsibilities, and that other employees with comparable positions were classified as EE-10 or EE-12. (*Id.* ¶ 7.) Her request was denied on July 7, 2008 with little explanation. (*Id.* ¶ 8.) When Plaintiff subsequently asked the MDC's Director of Human Resources to compare her responsibilities to other comparable positions at the MDC, she received no response. (*Id.* ¶¶ 9–10.) On September 17, 2008, Ms. Smith emailed the MDC's Diversity Officer Doris Poma, alleging race discrimination, but Ms. Poma reported finding no discrimination. (*Id.* ¶¶ 11–12.) Ms. Smith also met with the MDC's then-Chief Administrative Officer Robert Moore, who promised to look into Ms. Smith's request for job reclassification. (*Id.* ¶ 12.)

On January 2, 2009, having not received the requested reclassification, Ms. Smith filed a complaint with the Connecticut Commission on Human Rights and Opportunities ("CHRO"), claiming that the MDC was discriminating against her on the basis of race and color. (*Id.* ¶¶ 13–14.) As a result of the complaint, the MDC agreed to give Plaintiff a $10.00/week raise, which would put her in the EE-8 salary grade. (*Id.* ¶ 15.)

Several years later, on April 29, 2011, the MDC issued the "MDC Affirmative Action Policy Statement," and notified employees that they would have an opportunity to review and comment on the MDC's Affirmative Action Plan ("AAP"). (*Id.* ¶¶ 17–18.) In response, in August 2011, Plaintiff submitted written comments to the MDC's Affirmative Action Officer Erin Ryan and the MDC Commissioners. (*Id.* ¶ 19.) In her letter, Ms. Smith questioned the objectives of the AAP and the MDC's commitment to it. (*Id.* ¶¶ 20–24.)

On August 8, 2011, Ms. Ryan presented the final version of the AAP to the MDC's Personnel, Pension & Insurance Committee, noting that she had incorporated into the final version "the few comments" she had received. (*Id.* ¶ 25.) In mid-September 2011, the MDC's CEO asked Plaintiff to meet with him and interim Affirmative Action Officer Carl Nasto about Plaintiff's concerns. (*Id.* ¶ 26.) Two weeks later, Plaintiff's position with the MDC was eliminated as part of the October 7, 2011 Reduction in Force. (*Id.* ¶ 27.) Plaintiff alleges that the individual principally responsible for selecting her for job elimination was Defendant John Zinzarella. (*Id.* ¶ 28.)

## II.    Discussion[1]

Defendants' motion to dismiss is limited to the narrow issue of whether Plaintiff's Amended Complaint sufficiently states her § 1981 claims.[2] According to Defendants, Plaintiff's § 1981 claims should be dismissed because § 1983 provides the exclusive

---

[1] "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Although detailed allegations are not required, a claim will be found facially plausible only if "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Conclusory allegations are not sufficient. *Id.* at 678–79; *see also* Fed. R. Civ. P. 12(b)(6).

[2] Under § 1981, "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts" [defined as "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship," 42 U.S.C. § 1981(c)] . . . as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other." 42 U.S.C. § 1981(a).

remedy for claims of discrimination against local governments.[3]  (Mem. Supp. Mot. to Dismiss [Doc. # 25] at 5–6.)  In so arguing, Defendants rely heavily on the Supreme Court's decision in *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701 (1989).  *Jett* announced two related holdings: (1) "the express cause of action for damages created by § 1983 constitutes the exclusive federal remedy for violation of the rights guaranteed in § 1981 by state governmental units," *id.* at 733, and (2) "to prevail on [a] claim for damages against [a state governmental unit], [a] petitioner must show that the violation of 'his right to make contracts' protected by § 1981 was caused by a custom or policy within the meaning of *Monell* [*v. New York City Dep't of Social Servs.*, 436 U.S. 658[4]] and subsequent cases," *id.* at 735.

As Plaintiff notes, however, *Jett* was decided prior to the enactment of the 1991 Amendments to the Civil Rights Act.  Those Amendments added two new subsections to § 1981.  Subsection (b), intended to overrule the Supreme Court's holding in *Patterson v. McClean Credit Union*, 491 U.S. 164 (1989) that § 1981 did not prohibit workplace discrimination after the formation of a contract, *see CBOCS W., Inc. v. Humphries*, 553 U.S. 442, 450 (2008) ("Congress passed the Civil Rights Act of 1991 . . . with the design to supersede *Patterson*"), defines "make and enforce contracts" to include "the making, performance, modification, and termination of contracts, and the enjoyment of all

---

[3] Plaintiff stated expressly at oral argument that she does not seek to have the Court construe her claim under § 1981 as having been brought via § 1983.

[4] Under *Monell*, "a local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents.  Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983."  436 U.S. at 694.

4

benefits, privileges, terms, and conditions of the contractual relationship," 42 U.S.C. § 1981(b).

Subsection (c), designed at least in part to codify *Runyon v. McCrary*, 427 U.S. 160 (1976)'s holding[5] that § 1981 prohibits discrimination by private actors as well as discrimination by state actors, *see Federation of African Am. Contractors v. City of Oakland*, 96 F.3d 1204, 1212 (9th Cir. 1996) ("The legislative history surrounding the amendment to 42 U.S.C. § 1981 . . . suggests that Congress's intent in adding . . . subsection [c] was to codify *Runyon*."), states that "[t]he rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of State law," 42 U.S.C. § 1981(c).

There is a split in authority, however, on the question of whether, in adding subsection (c), Congress intended not just to codify *Runyon* but also to overrule *Jett*.[6] The minority of courts, including most notably the Ninth Circuit, has held that § 1981(c) does partially overrule *Jett* by creating an implied cause of action against state actors. *See Federation*, 96 F.3d at 1213; *see also Astrada v. Howard*, 979 F. Supp. 90, 95 n.2 (D. Conn. 1997) (finding, without analysis, that § 1981(c) overruled *Jett*); *Robinson v. Town of Colonie*, 878 F. Supp. 387, 405 n.13 (N.D.N.Y. 1995) (finding, in dicta, without analysis, that § 1981(c) overruled *Jett*). Plaintiff urges the Court to adopt the Ninth Circuit's reasoning.

---

[5] In *Patterson*, the Supreme Court "considered overruling *Runyon*, and a majority of the Court even suggested that *Runyon* was on life-support, kept alive only by the doctrine of stare decisis." *Arendale v. City of Memphis*, 519 F.3d 587, 598 (6th Cir. 2008).

[6] The Second Circuit has not weighed in on this issue.

5

### A.  The Ninth Circuit's Reasoning in *Federation*

*Federation* relies on the four factors outlined by the Supreme Court in *Cort v. Ash*, 422 U.S. 66 (1975) for finding an implied right of action:

> (1) Is the plaintiff one of the class for whose 'especial benefit' the statute was enacted; that is, does the statute create a federal right in favor of the plaintiff?
> (2) Is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one?
> (3) Is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff?
> (4) Is the cause of action one traditionally relegated to state law, so that it would be inappropriate to infer a cause of action based solely on federal law?

*Federation*, 96 F.3d at 1210 (quoting *Cort*, 422 U.S. at 78.)

Examining the language of subsection (c), the Ninth Circuit found that "the statute, by its plain terms, creates federal civil rights in favor of a class of persons that includes [the plaintiff in *Federation*]," and thus the first *Cort* factor favors implying a right of action.  *Id.* at 1211.  In addition, although it acknowledged that the reports of the House Education and Labor Committee and House Committee on the Judiciary cite *Runyon* and "do not address the amendment's potential effect on *Jett*," the court nonetheless concluded that implying a cause of action against state actors is consistent with Congress's intent.  *Id.* at 1212–13.  The court explained:

> These Committee reports . . . clearly contemplate that § 1981 rights are to receive parallel protections against state actors and private actors. . . . [B]y including language that explicitly protects § 1981 rights from "impairment" by *both* private and governmental entities, the amendment makes clear that Congress intended a comparable scope of protection against each type of defendant. . . .  To achieve parallel protection against private and governmental entities, comparable remedies against each type

6

> of defendant appear necessary. . . . [In addition,] we note that Congress did
> not add language explicitly recognizing a private cause of action against
> private actors, and yet this principle, too, was contained in the Supreme
> Court's decision in *Runyon*. . . .   Because § 1981(c) affords *identical*
> *protection* against "impairment by nongovernmental discrimination" and
> "impairment under color of State law," and because § 1981(c) implicitly
> codifies an implied cause of action against private defendants, we infer that
> § 1981(c) also contains an implied cause of action against state actors who
> "impair" a claimant's § 1981 rights.

*Id.* at 1213 (emphases in original).  Under the Ninth Circuit's analysis, the second *Cort*

factor thus also favors an implied right.

Turning to the third *Cort* factor, the court wrote that "[i]n our view, the

implication of a direct cause of action against municipalities under 42 U.S.C. § 1981

advances Congress's general purpose of remedying civil rights violations and its

particular purpose in enacting § 1981(c): ensuring that the well-established rights

contained in the statute are guaranteed against both private parties and state actors."  *Id.*

at 1214.  Finding that the fourth *Cort* factor also favors implying a right of action, the

court "conclude[d] that the amended 42 U.S.C. § 1981 contains an implied cause of

action against state actors, thereby overturning *Jett*'s holding that 42 U.S.C. § 1983

provides the exclusive federal remedy against state actors for the violation of rights under

42 U.S.C. § 1981." *Id.*

### B.  The Majority's Reasoning

Although some district courts have followed the Ninth Circuit's approach, the

majority of courts, including every other circuit court to have considered the issue, has

held that the 1991 Amendments to the Civil Rights Act did not overrule *Jett.  See Brown v.*

*Sessoms*, 774 F.3d 1016, 1021 (D.C. Cir. 2014); *Campbell v. Forest Preserve Dist. of Cook*

7

*Cnty., Ill.*, 752 F.3d 665, 671 (7th Cir. 2014); *McGovern v. City of Philadelphia*, 554 F.3d 114, 121 (3d Cir. 2009); *Arendale*, 519 F.3d at 598; *Bolden v. City of Topeka, Kan.,* 441 F.3d 1129, 1137 (10th Cir. 2006); *Oden v. Oktibbeha Cnty., Miss.*, 246 F.3d 458, 464 (5th Cir. 2001); *Butts v. Cnty. of Volusia*, 222 F.3d 891, 894 (11th Cir. 2000); *Dennis v. Cnty. of Fairfax*, 55 F.3d 151, 156 (4th Cir. 1995) (finding, without analysis that the 1991 Amendments did not overrule *Jett*).  Defendants rely on these cases in arguing that *Jett* remains good law.[7]

Many of the courts that have rejected the Ninth Circuit's reasoning emphasized the distinction between rights and remedies.  Thus, while acknowledging that "§ 1981(c)'s express language does indeed establish that individuals possess equal *rights* under § 1981 against both private and state discrimination," the Sixth Circuit noted that "such rights-creating language does not answer the question of whether civil rights plaintiffs enjoy the same *remedy* regardless of the identity of the defendant."  *Arendale*, 519 F.3d at 596 (emphases in original); *see also Brown*, 774 F.3d at 1021 (the language of subsection (c) "only addresses substantive rights and section 1983 remains the only provision to expressly create a remedy against persons acting under color of state law." (internal

---

[7] At oral argument, Defendants advanced an additional argument—that § 1981 does not create substantive rights for plaintiffs seeking to sue governmental actors.  However, this claim, for which Defendants have cited no authority, is belied by the plain language of the statute.  Section 1981(c) unambiguously creates a right "protected against . . . impairment under color of State law."  Indeed, it is this distinction between rights and remedies that underlies many of the decisions finding that § 1981(c) was not overruled by *Jett*.  *Jett* itself involved a claim against a state actor, and the Court held only that the claim had to be brought via § 1983 and that it could not be a claim of *respondeat superior*; the Court did *not* hold that § 1981 created no substantive rights that could be enforced against state actors.

quotation marks and citations omitted.)); *McGovern*, 554 F.3d at 119 ("The fact that § 1981(c) places an individual's *rights* on equal footing against discrimination by private and public actors does not necessarily imply the existence of an equal *remedy* against all defendants." (emphases in original)); *Oden*, 246 F.3d at 463 ("Subsection (c) addresses only substantive rights.  Section 1983 remains the only provision to expressly create a remedy against persons acting under color of state law."); *Butts*, 222 F.3d at 894 ("§ 1981(c) makes clear that the section creates a right that private or state actors may violate but does not itself create a remedy for that violation.").  "Just because a statute includes rights-creating language does not mean that it also provides a private cause of action to persons deprived of those rights, so long as Congress has also provided an effective means of vindicating the right elsewhere in federal law."  *Arendale*, 519 F.3d at 596.  "Accordingly, the fact that § 1981(c) establishes equal rights for parties suing private and state defendants does not, on its own, establish a private cause of action."  *Id.*  "The addition of subsection (c) creates no more of a need for the judiciary to imply a cause of action under § 1981 against state actors than existed when the Supreme Court decided *Jett*."  *Oden*, 246 F.3d at 463.

Many courts also found it significant that although "[t]he Civil Rights Act and its legislative history name several Supreme Court decisions which the Act is intended to overrule, . . . *Jett* was not identified even though it was decided less than two years before Congress acted," *Brown*, 774 F.3d at 1021 (internal quotation marks omitted), and "[a] week after the Court decided *Patterson*," *Campbell*, 752 F.3d at 669, which the legislative history does explicitly state an intent to overrule, *Arendale*, 519 F.3d at 598.  *See also Campbell*, 752 F.3d at 670 ("'Nothing in the 1991 amendments or its legislative history

evinces Congress's desire to alter the Supreme Court's conclusion in *Jett*, nor was *Jett* even mentioned despite the fact that it was decided [only] two years before Congress enacted the 1991 Act.'" (alteration in original) (quoting *McGovern*, 554 F.3d at 120)). Observing that "Congress does not overrule recent Supreme Court precedent so subtly," *Bolden*, 441 F.3d 1129, the majority of courts have concluded that "[s]ection 1981(c) reflects Congress's determination that *stare decisis* provided an inadequate firewall against a future Supreme Court decision obviating the rights recognized by *Runyon*" and "nothing in § 1981(c)'s history or text indicates that Congress intended it to serve some other purpose," *Arendale*, 519 F.3d at 598.

Finally, several courts have found support for the conclusion that § 1981(c) does not contain an implied right of action in "[t]he fact that Congress has created a specific remedy against state actors under § 1983," *Campbell*, 753 F.3d at 670, making inference of a right of action against state actors in § 1981 unnecessary and unwise.  *See also McGovern*, 554 F.3d at 119 ("Congress has already provided an effective means of vindicating a plaintiff's rights elsewhere in federal law.").

### C.  Analysis

Since *Federation* was decided, "the Supreme Court has reduced the importance of the *Cort* factors other than legislative intent, first by characterizing them as mere tools for determining legislative intent and then by subordinating them to statutory text as interpretive sources."  *Olmsted v. Pruco Life Ins. Co. of New Jersey*, 283 F.3d 429, 434 (2d Cir. 2002) (internal citations omitted).  Moreover, as the Second Circuit has observed, "the Supreme Court has come to view the implication of private remedies in regulatory

10

statutes with increasing disfavor." *Republic of Iraq v. ABB AG*, 768 F.3d 145, 170 (2d Cir. 2014) (internal quotation marks omitted).

In *Alexander v. Sandoval*, 532 U.S. 275 (2001), "the Supreme Court strictly curtailed the authority of the courts to recognize implied rights of action, requiring that a review of the text and structure of a statute yield a clear manifestation of congressional intent to create a private cause of action before a court can find such a right to be implied." *Lopez v. Jet Blue Airways*, 662 F.3d 593, 596 (2d Cir. 2011). The Supreme Court explained:

> Like substantive federal law itself, private rights of action to enforce federal law must be created by Congress. The judicial task is to interpret the statute Congress has passed to determine whether it displays an intent to create not just a private right but also a private remedy. Statutory intent on this latter point is determinative. Without it, a cause of action does not exist and courts may not create one, no matter how desirable that might be as a policy matter, or how compatible with the statute.

*Sandoval*, 532 U.S. at 286–87 (internal citations omitted). "To discern Congress's intent, we look first to the text and structure of the statute. [However,] [t]o 'illuminate' this analysis, we also consider factors enumerated in *Cort*." *ABB AG*, 768 F.3d at 170.

As the majority of courts to address this issue have noted, there is nothing in the text of § 1981(c) that suggests that Congress intended to create a right of action. Although the statute plainly contemplates the creation of substantive rights protecting individuals against discrimination by governmental and nongovernmental actors, it is silent on the question of how those rights will be enforced. In the Court's view, Congressional intent to create a private right of action against state actors in § 1981(c)

should not be inferred from the peculiar and obscure form of expression that Plaintiff urges.

The Ninth Circuit inferred from the fact that the statute creates "parallel protection against private and governmental entities" the need for "comparable remedies against each type of defendant." *Federation,* 96 F.3d at 1213. But, the court did not explain why § 1983 does not provide an adequate vehicle for the vindication of § 1981 rights. Indeed, the court appears to have acknowledged in a later decision that § 1983 *does* provide comparable remedies to § 1981. *See Pittman v. Oregon, Employment Dep't,* 509 F.3d 1065, 1070 (9th Cir. 2007). According to the court, "the argument that § 1981 contains a cause of action against municipalities was raised in *Federation* in an attempt to free plaintiffs from the obligation to demonstrate a 'policy or custom' as required under *Monell* to impose liability on local government unites." *Id.* However, "*Federation* ultimately held on the latter question that the 'policy or custom' requirement pertains to municipalities sued under § 1981." *Id.* "The result, as *Federation* stressed, was that the availability of a cause of action under § 1981 worked no practical change in the outcome that would have obtained under *Jett*." *Id.* Because even the Ninth Circuit concedes that § 1983 provides an adequate vehicle for the vindication of § 1981 rights, it is not necessary to imply a right of action against governmental actors in order to give effect to the language of § 1981(c).

The Court also finds significant the fact that while Congress made its intent to overrule *Patterson* and codify *Runyon* clear, the legislative history of the 1991 Amendments makes no mention at all of *Jett*, a decision reached just a week after *Patterson*. As the Third Circuit stated in *McGovern*, "[g]iven the long-favored rule of

statutory construction that repeals by implication are not favored, we would expect much more than complete silence if Congress intended to set aside such a notable ruling." 554 F.3d at 120.

Mindful of *Sandoval*'s admonition against finding an implied right of action in the absence of a clear statement from Congress that such a right was intended, this Court joins the majority of courts in ruling that § 1981(c) does not create a private right of action against governmental entities and *Jett* remains good law.

**III.   Conclusion**

For the foregoing reasons, Defendants' Motion to Dismiss [Doc. # 24] is GRANTED.  Counts One and Two of the Amended Complaint are dismissed.

IT IS SO ORDERED.

_____/s/_____
Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 13th day of May, 2015.